# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
| | | |
|---|---|---|
| LINDA WIRTSHAFTER, | \* | |
| | \* | No. 18-1562V |
| Petitioner, | \* | Special Master Christian J. Moran |
| | \* | |
| v. | \* | Filed: April 16, 2021 |
| | \* | |
| SECRETARY OF HEALTH | \* | Attorneys' fees and costs; |
| AND HUMAN SERVICES, | \* | reasonable basis; onset. |
| | \* | |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Howard D. Mishkind, Mishkind Law Firm Co., L.P.A., Beachwood, OH, for petitioner;
Ryan D. Pyles, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION DENYING ATTORNEYS' FEES AND COSTS[1]

Linda Wirtshafter alleged that an influenza vaccination she received on October 15, 2015, caused her to develop small fiber neuropathy.  Pet., filed Oct. 9, 2018, ¶¶ 2-3.  After she moved to dismiss her petition, a decision found she was not entitled to compensation.  Wirtshafter v. Sec'y of Health & Human Servs., No. 18-1562V, 2019 WL 7580153 (Fed. Cl. Spec. Mstr. Dec. 20, 2019).

As the Vaccine Act permits, Ms. Wirtshafter seeks an award of attorneys' fees and costs.  To establish her eligibility for attorneys' fees and costs, Ms.

---

[1] The E-Government Act, 44 § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website (https://www.uscfc.uscourts.gov/aggregator/sources/7).  Once posted, anyone can access this decision via the internet.  Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special master will be reflected in the document posted on the website.

Wirtshafter must establish that the claim set forth in her petition was supported by reasonable basis. The Secretary objects, maintaining that the objective evidence does not support a finding of reasonable basis. For the reasons explained below, Ms. Wirtshafter has not presented sufficient evidence to have a reasonable basis for the assertion that the vaccination caused her small fiber neuropathy.

I.     **Events in Ms. Wirtshafter's Life**[2]

Prior to vaccination, on March 28, 2013, Ms. Wirtshafter saw her primary care physician, Dr. Michael Eckstein, for a three-month history of "an area of hyperesthesia over the upper thoracic spine." Exhibit 4 at 18. The diagnosis was a "[b]urning [s]ensation ([d]ysesthesia)," and the etiology was uncertain. Id. at 19. Ms. Wirtshafter's medications at that time included Voltaren transdermal gel, a topical NSAID. Id. On February 22, 2014, Ms. Wirtshafter saw Dr. Eckstein for continued hypersensitivity of a region of skin at the base of her neck, and her current medications again included Voltaren. Id. at 20. The impression noted at this visit was a "[t]ype of neuralgia at the base of the C-spine." Id. at 21.

On October 15, 2015, Ms. Wirtshafter received a flu vaccination. Exhibit 2 at 1-2. On October 16, 2015, Ms. Wirtshafter saw Dr. Eckstein for a history of "[t]ingling in both legs off-and-on for one week without associated weakness." Exhibit 4 at 16. He also noted: "Pain in ball of right foot for one week as well. No swelling noted. Otherwise patient has been well. Slight cold 2 weeks ago which has resolved." Id. Ms. Wirtshafter's "active problems" at the time were a burning sensation, a disc disorder of her cervical region, and "[s]pondylosis of cervical region without myelopathy or radiculopathy." Id. The impression was "[t]ingling in lower extremities of unclear etiology." Id. at 17.

On October 31, 2015, in a handwritten note, a provider – who it can be deduced was likely Dr. Eckstein, although this is unclear – noted in part: "Tingling in arms, legs, [and] face at this time. Symptoms started in the arms and legs [three weeks] ago then resolved. Diffuse tingling has returned." Exhibit 4 at 25. Ms. Wirtshafter was to see a neurologist "next week." Id.

On November 3, 2015, Ms. Wirtshafter saw a neurologist, Dr. Stefan Dupont, and reported that since seeing Dr. Eckstein on October 16, 2015, her

---

[2] The parties' briefs identify relatively few medical records relevant to the question of reasonable basis.

"tingling [had] gone everywhere including [her] face, chest, [and] torso. More on [the] left but occur[red] bilaterally." Exhibit 5 at 12.

On December 8, 2015, Dr. Dupont noted that Ms. Wirtshafter had made an appointment with a neuromuscular specialist "in order to explore the possibility of a small fiber neuropathy." Id. at 11. Dr. Dupont explained to Ms. Wirtshafter that he did not have a neurological explanation for her symptoms. Id.

On November 24, 2015, Ms. Wirtshafter saw Dr. Deborah Venesy at the Cleveland Clinic Foundation Center for Spine Health. Exhibit 7 at 1. Ms. Wirtshafter expressed concern that a history of a spine fusion for scoliosis as a teenager may have been related to her recent symptoms. Id. The symptoms of diffuse paresthesia in her arms, legs, chest, and occasionally, lips and face, were reported to have been present for five to six weeks with a progressive onset. Id. Dr. Venesy planned to refer Ms. Wirtshafter to a neuromuscular specialist. Id. at 4.

On January 13, 2016, Ms. Wirtshafter saw a neurologist, Dr. Bashar Katirji, for symptoms starting in October 2015. Exhibit 8 at 10. Testing was planned and she was prescribed gabapentin. Id. at 14. On February 16, 2016, Ms. Wirtshafter advised that her insurance did not authorize autonomic testing for a small fiber neuropathy and that gabapentin was "helping her some." Id. at 8. Dr. Katirji increased her gabapentin dosage. Id.

On March 29, 2016, Dr. Katirji planned a skin biopsy for a small fiber neuropathy, instead of autonomic testing. Exhibit 8 at 2. Ms. Wirtshafter's condition improved somewhat with gabapentin, but her skin was "still very sensitive to touch and the left side[,] especially the left leg[,] still bother[ed] her more." Id. Ms. Wirtshafter reported to Dr. Katirji that she tried Voltaren cream, which "kind of" helped. Id.

On April 6, 2016, Ms. Wirtshafter saw a neurologist, Dr. Jinny Tavee, upon a referral from Dr. Venesy. Exhibit 9 at 1. The history at this appointment included:

> Onset of symptoms last Oct 2015 in which she felt intermittent tingling going down the side of her legs from thighs down into the outside toes while sitting at her desk at work. At that time, had mild back ache but no distinct pain. A few weeks later symptoms abruptly spread up to her arms, chest and face/lips over a single weekend. [Ms. Wirtshafter] felt hypersensitive to everything on her skin. . . . Prior to the abrupt spread of symptoms, [Ms. Wirtshafter] had the flu shot at CVS but can't remember exactly when she

3

had it. Also, [Ms. Wirtshafter] states that over the last year she felt episodes in which her bottom felt bruised when she sat down. Also had a [two] week episode in which the ball of the right foot hurt and she couldn't step down very hard. But otherwise no preceding illnesses.

Id. The impression, pending the biopsy, included: "Suspect nonlength dependent generalized polyneuropathy affecting small sensory fibers that may represent the small fiber variant of Guillain-Barre syndrome that was triggered by the flu vaccination." Id. at 3.

On May 5, 2016, Ms. Wirtshafter emailed Dr. Tavee's office to report that her skin biopsy was negative and further stated, "I do feel like the anti-depressant has helped as well as the compounded cream I'm using on my feet." Id. at 12. However, on May 24, 2016, a nurse relayed Dr. Tavee's impression of the biopsy by email as follows: "There was an abnormality. . . .This is borderline reduced but is enough to make the diagnosis of [small fiber neuropathy (SFN)]." Id. at 21.

In follow-up on July 21, 2016, Dr. Tavee's impression was "[p]ossible immune mediated component has now evolved to chronic SFN." Id. at 36 (also noting in the history, "[s]uspected etiology immune mediated related to preceding flu vaccination"). Dr. Tavee made a plan for management of Ms. Wirtshafter's symptoms. Id.

On October 20, 2017, Dr. Steven Shook first saw Ms. Wirtshafter and took over as her treating neurologist. Exhibit 11 at 1; see also exhibit 3 at 1 (Dr. Shook noting that Dr. Tavee left the Cleveland Clinic). She reported to him that within a "few days" of receiving her flu vaccination, "she experience[d] neuropathic pain in all limbs, face and chest." Id.

On October 8, 2018, Dr. Shook completed an affidavit for petitioner. Exhibit 3. He relied on the history that petitioner's "neuropathic pain in all limbs, face and chest [began] within a few days of receiving her flu shot." Id. at 2. With regard to causation, he concluded, "Based on the history provided by the patient and information available to me, it is my opinion that there is a causal relationship between her flu vaccination and her ongoing neuropathic pain which is suggestive of a possible immune-mediated phenomenon related to her flu vaccination." Id.

Additional medical records do not affect the determination of whether reasonable basis supports the claim set forth in Ms. Wirtshafter's petition.

## II.  **Procedural History**

Ms. Wirtshafter filed a petition on October 9, 2018.  A key assertion concerned when she began to have neurologic problems.  Ms. Wirtshafter alleged she "developed a Small Fiber Neuropathy (a variant of GBS); the onset of tingling in her legs within 24 hours of receiving the vaccine, followed by tingling in her arms and face."  Pet. ¶ 3.  She also maintained that her small fiber neuropathy was a "direct and proximate result" of the flu vaccine that she received on October 15, 2015.  Id.

Ten days after Ms. Wirtshafter filed her petition, she was directed to file additional information, including an affidavit regarding the onset of her problems.  Order, issued Oct. 19, 2018.  Ms. Wirtshafter filed this onset affidavit as well as more materials.  Exhibits 12-19.

In her affidavit, Ms. Wirtshafter specifically challenged the notation in Dr. Eckstein's October 16, 2015 record, which stated that she was having "[t]ingling in both legs off-and-on for one week without associated weakness."  Exhibit 4 at 16.  Ms. Wirtshafter averred:  "My symptoms began the day after the flu shot. I do not know where Dr. Eckstein got that information about it starting approximately a week before the visit. I remember specifically noticing the symptoms at work a day after the flu shot and calling his office and was surprised I got an appointment that same day."  Exhibit 12 ¶ 11.

A status conference was held on November 20, 2018, to discuss Ms. Wirtshafter's petition and evidence.  The undersigned explained that because of the discrepancy between Dr. Eckstein's record and Ms. Wirtshafter's affidavit, a hearing to determine when her neurologic problems began would probably be required.  In the meantime, Ms. Wirtshafter could gather additional affidavits from people knowledgeable about her health around October 15, 2015.  Ms. Wirtshafter submitted three more affidavits and other material.  Exhibits 20-24.

Approximately eight months later, the Secretary filed his report.  The Secretary contested Ms. Wirtshafter's entitlement to compensation.  The Secretary raised two obstacles: (1) the medical records showed that petitioner's tingling appeared to pre-date vaccination, and (2) even if the tingling started one day after vaccination, a one-day latency between vaccination and onset is too rapid.  Resp't's Rep., filed Sep. 23, 2019, at 7.

In the ensuing status conference, the undersigned commented that in previous adjudications, the undersigned has found that a one-day latency is too

5

quick.  Petitioner's counsel stated that he would consult with petitioner as to whether she wished to proceed with expert reports or move for dismissal.  The undersigned ordered petitioner either to file a status report indicating her intent to proceed with litigation or, in the alternative, to move for voluntary dismissal.  Order, issued Oct. 31, 2019, at 1 (citing Contreras v. Sec'y of Health & Human Servs., No. 05-626V, 2014 WL 8098606, at *2-8 (Fed. Cl. Spec. Mstr. Oct. 24, 2014); Forrest v. Sec'y of Health & Human Servs., No. 14-1046V (Fed. Cl. Spec. Mstr. Jan. 28, 2019)).

Ms. Wirtshafter moved for a decision dismissing her petition on December 19, 2019.  Her case was then dismissed.  Wirtshafter v. Sec'y of Health & Human Servs., No. 18-1562V, 2019 WL 7580153 (Fed. Cl. Spec. Mstr. Dec. 20, 2019).

Ms. Wirtshafter requested an award of her attorneys' fees and costs.  Pet'r's Mot., filed Jan. 29, 2020.  After the Secretary disputed the reasonable basis for Ms. Wirtshafter's claim, adjudication was stayed pending the outcome of Cottingham v. Secretary of Health & Human Services, which was expected to affect precedent regarding reasonable basis determinations.

After the Federal Circuit issued Cottingham, 971 F.3d 1337 (Fed. Cir. 2020), the parties filed briefs reiterating their positions.  In support of her argument that reasonable basis supports the claim set forth in the petition, Ms. Wirtshafter identified four pieces of evidence: (1) her affidavit, (2) Dr. Katirji's medical records, (3) Dr. Tavee's medical records, and (4) Dr. Shook's affidavit.  Pet'r's Suppl. Br., filed Oct. 1, 2020, at 4-5.[3]

The Secretary disagrees.  To the Secretary, Dr. Eckstein's medical records show that Ms. Wirtshafter had tingling before the vaccination.  Thus, the vaccination could not have caused the tingling.  Resp't's Suppl. Br., filed Oct. 27, 2020, at 7-8.  In addition, the Secretary was not aware of any case with similar facts in which a one-day onset was accepted as an appropriate latency.  Id. at 8-9.  The Secretary concluded:  Ms. Wirtshafter's "claim therefore lacked a reasonable basis when filed, and one was never established."  Id. at 9.

---

[3] In an earlier pleading, Ms. Wirtshafter made various policy-based arguments as to why reasonable basis should be found in her case.  Pet'r's Reply, filed Feb. 18, 2020.  While those arguments have been considered, the focus of the analysis is the objective evidence.

6

After the issuance of the Federal Circuit's decision in James-Cornelius v. Secretary of Health & Human Services, the parties were subsequently provided with an additional opportunity to submit supplemental briefs on the issue of reasonable basis in light of the developments from this case. 984 F.3d 1374 (Fed. Cir. 2021). Ms. Wirtshafter filed her supplemental brief on March 5, 2021, and the Secretary filed his response on March 19, 2021. In her brief, Ms. Wirtshafter reiterated the sufficiency of the combination of her medical record and affidavit evidence to support reasonable basis, specifically pointing to Dr. Shook's opinion supporting causation. Ms. Wirtshafter emphasized the point from James-Cornelius that a formal medical opinion is not required to establish reasonable basis, as well as the points that medical records constitute evidence that can be provided to support causation for the reasonable basis determination. Pet'r's Suppl. Br., filed Mar. 5, 2021. The Secretary in response stated that, while affidavits and medical records can constitute evidence supporting reasonable basis, this is not the case where the affidavits and medical opinions therein "irreconcilably conflict" with the medical records. Resp't's Suppl. Br., filed Mar. 19, 2021, at 2.

Ms. Wirtshafter's motion is ready for adjudication.

### III.    Standards for Adjudication

Petitioners who have not been awarded compensation are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa—15(e)(1). As the Federal Circuit has stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and costs. Simmons v. Sec'y of Health & Human Servs., 875 F.3d 632, 635 (Fed. Cir. 2017).

"Good faith" is a subjective standard. Id.; Hamrick v. Sec'y of Health & Human Servs., No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she honestly believes that a vaccine injury occurred. Turner v. Sec'y of Health & Human Servs., No. 99-544V, 2007 WL 4410030, at * 5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). The Secretary has not challenged petitioner's good faith here and the undersigned finds the Secretary's position that good faith exists to be reasonable. Accordingly, Ms. Wirtshafter's eligibility for attorneys' fees and costs turns on the question of the reasonable basis for the petition.

Reasonable basis is purely an evaluation of the objective weight of the evidence. Simmons, 875 F.3d at 636. Because evidence is "objective," the

Federal Circuit's description is consistent with viewing the reasonable basis standard as creating a test that petitioners meet by submitting evidence. See Chuisano v. Sec'y of Health & Human Servs., No. 07-452V, 2013 WL 6234660, at *12-13 (Fed. Cl. Spec. Mstr. Oct. 25, 2013) (explaining that reasonable basis is met with evidence), mot. for rev. denied, 116 Fed. Cl. 276 (2014).

In practice, it has proven difficult to define the modicum of evidence that carries petitioner's burden regarding reasonable basis. When the Federal Circuit and judges of the Court of Federal Claims have commented on the reasonable basis standard, they often do not speak of the amount of evidence that confers reasonable basis. Instead, they have sometimes spoken to the types of situations where reasonable basis cannot be said to exist. For example, a petition based purely on "unsupported speculation," even speculation by a medical expert, is not sufficient to find a reasonable basis. Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994) ("Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorney fees and costs by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury"). As another example, when "the medical and other written records contradict the claims brought forth in the petition," a special master is not arbitrary in concluding that reasonable basis for the petition did not exist. Murphy v. Sec'y of Health & Human Servs., 30 Fed. Cl. 60, 62 (1993), aff'd without op., 48 F.3d 1236 (Fed. Cir. 1995) (table).

In Simmons, a judge found petitioner's failure to submit a petition that complied with the Vaccine Act's requirements supported a finding that reasonable basis for the petition did not exist. The judge reasoned that section 11(c) of the Vaccine Act requires that petitions "be accompanied with evidence of injury" [to] ensure[] that petitioners and their counsel make some effort to establish that there was a vaccination and an injury that may be linked to the vaccine." Simmons v. Sec'y of Health & Human Servs., 128 Fed. Cl. 579, 583 (2016), aff'd, 875 F.3d 632 (Fed. Cir. 2017).

While those older cases presented examples in which petitioners were found not to have satisfied the reasonable basis standard, two more recent cases are examples in which petitioners might have satisfied the reasonable basis standard. The Federal Circuit clarified the reasonable basis standard, specifically materials that constitute objective evidence, in Cottingham v. Secretary of Health & Human Services, stating that "failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion." 971 F.3d 1337, 1345 (Fed. Cir. 2020). Furthermore, in categorizing medical records as objective evidence, the Federal Circuit stated, "[m]edical records can support

8

causation even where the records provide only circumstantial evidence of causation." Id. at 1346.  The Federal Circuit in Cottingham specified that "[w]e make no determination on the weight of the objective evidence in the record or whether that evidence establishes reasonable basis, for these are factual findings for the Special Master and not this court." Id. at 1347.

Finally, in its most recent opinion regarding the reasonable basis standard, the Federal Circuit stated that medical records, affidavits, and sworn testimony all constitute objective evidence to support reasonable basis. James-Cornelius v. Sec'y of Health & Human Servs., 984 F.3d 1374, 1379-81 (Fed. Cir. 2021).  The Federal Circuit further clarified that "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable basis." Id. at 1379 (citing Cottingham, 971 F.3d at 1346).  These two most recent decisions guide the analysis regarding what types of evidence constitute objective evidence of reasonable basis, as originally articulated in Simmons, though the ultimate weighing of such evidence is left up to the special master.

### IV.   Analysis

Of the four items of evidence Ms. Wirtshafter put forward, the first two contribute relatively little, if anything, to the evaluation of reasonable basis.  These are Ms. Wirtshafter's affidavit and Dr. Katirji's medical records.

In Ms. Wirtshafter's affidavit, she avers: "on 10/16/15, I started having tingling in my legs that subsequently spread to my arms and face."  Exhibit 1 (affidavit) ¶ 5.  "Based upon the medical records (see medical records of Drs. Tavee and Li, Exhibits '2' and '3,' respectively), I have developed Small Fiber Neuropathy (a variant of GBS) as a direct result of the flu vaccination administered on October 15, 2015." Id. ¶ 8.  However, Ms. Wirtshafter's belief supports her good faith, a condition separate from reasonable basis required for eligibility for attorneys' fees.

Similarly, Dr. Katirji's medical records do not greatly influence the evaluation of reasonable basis.  Ms. Wirtshafter appears to rely upon a history that Dr. Katirji obtained during Ms. Wirtshafter's first appointment on January 13, 2016.  Then, Ms. Wirtshafter told Dr. Katirji that "[s]he is here today because of

tingling, pins and needle sensation all over her body started in October 2015." Exhibit 8 at 10.[4]

While this record offers some support for Ms. Wirtshafter, Dr. Katirji's January 13, 2016 record is not dispositive by itself for two reasons. First, the account is somewhat imprecise about where Ms. Wirtshafter was having tingling and when she was having that tingling. Dr. Eckstein's contemporaneous records indicate that around October 5, 2015, Ms. Wirtshafter was having tingling in both legs, see exhibit 4 at 16, and by October 31, 2015, she was having tingling in her arms and face, see id. at 25. Thus, Dr. Katirji's record is consistent with a chronology in which Ms. Wirtshafter's tingling in one part of her body began before vaccination and progressed to be "all over her body" by the end of October 2015.

Second, regardless of when Dr. Katirji understood the tingling to have begun, Dr. Katirji does not associate the tingling with the October 15, 2015 vaccination. Dr. Katirji's records do not refer to an influenza vaccination (or immunization) at all. See exhibit 8. Thus, Dr. Katirji's record does not directly support the petition's claim that the flu vaccination caused Ms. Wirtshafter's small fiber neuropathy.

However, the third and fourth pieces of evidence (Dr. Tavee's reports and Dr. Shook's affidavit) provide more direct support. At the end of the report from the initial meeting between Ms. Wirtshafter and Dr. Tavee at the Cleveland Clinic, Dr. Tavee suspected a "generalized polyneuropathy affecting small sensory fibers that may represent the small fiber variant of Guillain-Barré syndrome that was triggered by the flu vaccination." Exhibit 9 at 3. Later, after Dr. Tavee reviewed the results of a skin biopsy, Dr. Tavee continued to "suspect[] SFN [small fiber neuropathy]." Id. at 36 (July 21, 2016 report). Dr. Tavee repeated "Suspected etiology [is] immune mediated related to preceding flu vaccination." Id.

Dr. Tavee saw Ms. Wirtshafter twice more in 2016 and, then, left the Cleveland Clinic. Dr. Steve Shook took over care for Ms. Wirtshafter. Dr. Shook saw her on October 20, 2017. Exhibit 11. Dr. Shook's history, which derived in part from Dr. Tavee's records, stated that Ms. Wirtshafter "[r]eceived a flu shot with in [sic] a few days she experience[d] neuropathic pain in all limbs, face and

---

[4] Ms. Wirtshafter cited page 18 of exhibit 10. Pet'r's Suppl. Br. at 3. However, that page presents the result of a brain MRI.

chest." Id. at 1.  Dr. Shook also recorded that Ms. Wirtshafter has a "history of preceding flu vaccination [that] was suggestive of possible immune-mediated phenomenon." Id.

Dr. Shook provided more information in an affidavit for this litigation.  He stated that when he saw Ms. Wirtshafter in October 2017, "[h]er prior medical records were reviewed at that visit including a history of neuropathic pain in all limbs, face and chest within a few days of receiving her flu shot."  Exhibit 3 (affidavit signed Oct. 8, 2018) ¶ 6.  This background is the foundation for Dr. Shook's opinion on which Ms. Wirtshafter relies.  Dr. Shook further stated: "Based upon the history provided by the patient and information available to me, it is my opinion that there is a causal relationship between her flu vaccination and her ongoing neuropathic pain which is suggestive of a possible immune-mediated phenomenon related to her flu vaccination." Id. ¶ 7.

The Secretary's response to Dr. Tavee and Dr. Shook is to challenge the information provided to them.  For example, the day after Ms. Wirtshafter first saw Dr. Tavee, Ms. Wirtshafter presented her account in an email.  Ms. Wirtshafter stated:

> I wanted to let you know that I checked with CVS and my Dr's. office and found out when I got the flu shot and when I went to my internist concerning my symptoms.
>
> I got the flu shot on October 15th and saw my internist, Dr. Eckstein, on the 16th (I kind of remember being surprised that they could get me in that day when I called in the morning about having tingly sensations in my legs). I then went back to Dr. Eckstein on the 31st (two weeks later) when things seemed to get worse and scary feeling. That's when he suggested I see a neurologist.
>
> If this is from the flu shot, which it's starting to sound like it is, is there any chance it could slowly get better on it's own?

Exhibit 9 at 7.

The Secretary disagrees with this account because "the onset of petitioner's symptomatology began acutely before vaccination."  Resp't's Suppl. Br. at 7.  The

11

Secretary maintains that opinions about the cause of Ms. Wirtshafter's small fiber neuropathy should not be credited because the opinions from treating doctors such as Dr. Shook show their "understanding of the facts was based on petitioner's word alone and did not account for the facts as reflected in the contemporaneous medical records." Id. at 8.

Whether the objective evidence supports Ms. Wirtshafter's claim that the flu vaccine caused her neuropathy is a vexing question. On the one hand, the records from Dr. Tavee and Dr. Shook provide some facial support. On the other hand, the opinions expressed in those records are based upon inaccurate information. While the answer is not clear, the undersigned finds that Ms. Wirtshafter has not met her burden of establishing the reasonable basis for the claim set forth in her petition. Three reasons support this conclusion.

First, a finding that Ms. Wirtshafter's case lacked a reasonable basis is consistent with an appellate authority with similar facts. See Murphy v. Sec'y of Health & Human Servs., No. 90-882V, 1991 WL 74931 (Cl. Ct. Spec. Mstr. Apr. 25, 1991). Today, Murphy is often cited as a well-known case in which a special master weighed the value of medical records created contemporaneously with the events the medical records described against the value of affidavits created many years later. The special master found that the medical records were more reliable, id. at *5, and the Claims Court ruled that this finding was not arbitrary. 23 Cl. Ct. 726, 734 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992). Under the representations presented in the contemporaneously created medical records, the petitioners in Murphy were not entitled to compensation.

A less recognized aspect to Murphy is the ensuing motion for attorneys' fees and costs, which is more relevant to the case at hand. Although the special master's 1993 decision denying an award of attorneys' fees and costs is unpublished, the opinion on a motion for review states the special master found a lack of reasonable basis because "the medical records and other written records contradict the claims brought forth in the petition." 30 Fed. Cl. 60, 61 (1993). Upon a motion for review, the petitioners argued that the special master abused his discretion in denying attorneys' fees and costs. More specifically, the petitioners argued that "because they submitted expert opinion to support their claim, they had a reasonable basis for their case as a matter of law." Id. at 62.

The Court, however, rejected the petitioners' argument and ruled that the special master was not arbitrary in finding a lack of reasonable basis. The Court reasoned that an expert report premised on unreliable assertions does not confer reasonable basis:

> [The petitioners'] position assumes that special masters rely upon expert testimony without determining whether it is corroborated by the facts. This position is not plausible, as expert testimony in and of itself does not determine reasonableness. . . . [T]he expert opinion submitted by petitioners was founded upon Mrs. Murphy's version of the events, a version found to be unreliable by the special master.

Id. at 63.

While neither the special master's decision nor the opinion denying the motion for review from the judge of the Court of Federal Claims constitutes binding authority, see Boatmon v. Sec'y of Health & Human Servs., 941 F.3d 1351, 1358 (Fed. Cir. 2019), Murphy does provide some appellate guidance. According to Murphy, a discrepancy between medical records created contemporaneously and later-given assertions could, in some cases, weigh against a finding that reasonable basis supported the claim set forth in the petition. This guidance points against a finding of reasonable basis in Ms. Wirtshafter's case.[5]

Second, Ms. Wirtshafter contributed to inconsistencies in medical records. For example, when Ms. Wirtshafter checked with Dr. Eckstein after seeing Dr. Tavee, she (accurately) informed Dr. Tavee that she received her flu shot on October 15, 2015. However, she appears not to have told Dr. Tavee that during her October 16, 2015 appointment, she told Dr. Eckstein that she was having "[t]ingling in both legs off-and-on for one week without associated weakness." Exhibit 4 at 16. As a contemporaneous statement given in the context of seeking medical treatment, Dr. Eckstein's record is presumed accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). Despite her October 30, 2018 affidavit (exhibit 12), Ms. Wirtshafter has not presented a

---

[5] While the outcome in Murphy, a denial of attorneys' fees and costs, is consistent with the outcome in this decision, also a denial of attorneys' fees and costs, Murphy does not require this result. Other special masters might reasonably reach different conclusions, especially when the nature of the inconsistency between versions of events differs. Cf. SiOnyx LLC v. Hamamatsu Photonics K.K., 981 F.3d 1339, 1355 (Fed. Cir. 2020) (indicating that while a district court "may have been within its right" to award attorneys' fees pursuant to 35 U.S.C. § 285, the denial of fees was not an abuse of discretion).

13

reasonable basis for challenging a medical record created approximately three years earlier.

Third, even if Dr. Eckstein erred in stating that Ms. Wirtshafter's symptoms began before the vaccination, then Ms. Wirtshafter still has not presented a consistent case. In litigation, Ms. Wirtshafter averred that her neurologic problems began *one day* after vaccination. Exhibit 1 (affidavit) ¶ 5. In contrast, Dr. Shook states that Ms. Wirtshafter had a "a history of neuropathic pain in all limbs, face and chest within *a few days* of receiving her flu shot." Exhibit 3 (affidavit) ¶ 6 (emphasis added). While the term "a few days," is not precise, it suggests that the onset is at least three days. The difference between one day and three (or more) days is critical. While the undersigned has found that one day is not sufficient time to develop antibodies that cause a demyelinating condition, see Contreras v. Sec'y of Health & Human Servs., No. 05-626V, 2014 WL 8098606, at *2-8 (Fed. Cl. Spec. Mstr. Oct. 24, 2014); Forrest v. Sec'y of Health & Human Servs., No. 14-1046V, 2019 WL 925495, at *7-8 (Fed. Cl. Spec. Mstr. Jan. 28, 2019), three days is permissible. See 42 C.F.R. § 100.3 ¶ XIV.D. (Vaccine Table associating flu vaccine with Guillain-Barré syndrome occurring within 3-42 days). Dr. Shook has not presented an opinion that assumes the accuracy of Ms. Wirtshafter's account that her neurologic problems began the day after vaccination. When an expert bases an opinion upon an unsupported set of facts, a special master does not have to credit the expert's opinion. See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (Fed. Cir. 1993).

The presence of an expert report does not mandate a finding of reasonable basis. This lesson is demonstrated by the Federal Circuit's earlier precedential opinion on reasonable basis, Perreira v. Secretary of Health & Human Services. In that case, the Federal Circuit held that the Chief Special Master could determine that a petitioner lacked reasonable basis, despite an expert report, because "the expert opinion was grounded in neither medical literature nor studies." Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994). "Perreira demonstrates that special masters enjoy discretion to find that a claim lacked a reasonable basis when the evidence on which the petitioners relies (there, an expert's report) is rooted in unsupported speculation." Ellis v. Sec'y of Health & Human Servs., No. 13-336V, 2019 WL 3315326, at *4 (Fed. Cl. Spec. Mstr. June 24, 2019). The Federal Circuit provided the "reasonable basis" standard with some teeth in Perreira, by declaring: "Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorneys' fees and costs by merely having an expert state an unsupported opinion." 33 F.3d at 1377. Here, Dr. Shook's assertion that Ms. Wirtshafter's

neurologic problems began a "few days" after vaccination lacks support from her affidavit.

The undersigned has considered all medical records and affidavits. Ultimately, when the record is considered as a whole, it does not support a finding of reasonable basis. Dr. Tavee's reports and Dr. Shook's affidavit either directly contradict Ms. Wirtshafter's claim or are based on incorrect information.

In sum, despite some valid arguments, Ms. Wirtshafter has not carried her burden of establishing the reasonable basis that the vaccination caused the onset of neurologic problems the next day. This burden, as pointed out above, is less than the preponderance of the evidence. But, even under this lower burden of proof, the reasonable basis for Ms. Wirtshafter's claim has not been established.

## V.     Conclusion

Ms. Wirtshafter's motion for attorneys' fees and costs is denied on the ground that she did not establish that she is eligible for an award. The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed.

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master